S99P1112. HOLSEY v. THE STATE.
(524 SE2d 473)

FLETCHER, Presiding Justice.

A jury convicted Robert Wayne Holsey of murder in the shooting

---

death of Deputy Sheriff Will Robinson.[1] The jury fixed the sentence for the murder at death. Holsey appeals, contending that he was absent from a jury view at which the trial court and an unsworn store clerk answered questions from jurors. Because Holsey later acquiesced in the improprieties occurring during the jury view, we affirm.

The evidence at trial showed that shortly before 1:30 a.m. on December 17, 1995, Holsey entered the Jet Food Store in Milledgeville with a gun and demanded money. After receiving money from the store's cash register, Holsey directed the store clerk to open the store's lottery machine. Although Holsey ordered the clerk into a back room, the clerk was able to observe Holsey leave in a small red automobile. The clerk immediately called the police and provided a description of Holsey and his car.

Less than four minutes after Holsey left the food store, Deputy Sheriff Will Robinson stopped a red Ford Probe at a nearby motel. He relayed the vehicle's license plate number by radio and approached the vehicle; Holsey then fired. Forensic evidence showed that the deputy suffered a fatal head wound.

Several guests at the motel observed a person matching Holsey's description returning to the red Ford Probe and speeding away. The police soon discovered the vehicle and gave chase, but Holsey was able to avoid apprehension. One witness testified that she observed the red Ford Probe and recognized Holsey, with whom she was personally acquainted.

Holsey's girlfriend testified that shortly after the shooting Holsey called and asked her to meet him at his sister's house. He told her to drive her blue Jeep Cherokee rather than her red automobile because the police were searching for a red Ford Probe. When she arrived at the house, Holsey was hiding behind a fence. Holsey had his girlfriend drive him past the murder scene. When she refused his

---

[1] The crimes occurred during the early morning hours of December 17, 1995. Holsey was indicted by the Baldwin County Grand Jury on January 8, 1996, for malice murder, felony murder, and armed robbery. The state filed notice of its intent to seek the death penalty for the murder on January 12, 1996. Upon Holsey's motion for a change of venue, his case was ordered transferred to the Superior Court of Morgan County. The trial began on February 1, 1997, and the jury found Holsey guilty on all counts on February 11, 1997. The felony murder conviction was vacated by operation of law, and on February 13, 1997, the jury fixed the sentence for the malice murder at death based upon a finding of four statutory aggravating circumstances: Holsey had been previously convicted of a capital felony; the murder was committed while Holsey was engaged in the commission of another capital felony; the murder was committed for the purpose of avoiding, interfering with, or preventing his lawful arrest; and the murder was committed against a peace officer engaged in his official duties. The trial court imposed a sentence of death for the malice murder and a sentence of life imprisonment without parole for the armed robbery in accordance with OCGA § 17-10-7 (b) (2). Holsey filed a motion for a new trial on March 7, 1997, and amended the motion on January 6, 1999. The trial court denied the amended motion for a new trial on January 19, 1999. This appeal was docketed on April 28, 1999, and orally argued on July 13, 1999.

request to be driven to his mother's house where he could monitor a police scanner, Holsey had her drive him through back roads to his sister's house where she had picked him up. Holsey instructed her to park directly behind the red Ford Probe in order to conceal its license plate.

While Holsey and his girlfriend were still in the Jeep, a law enforcement officer drove up to the red Ford Probe. The officer checked the Probe's license plate number, which matched the number transmitted by the victim. The officer then illuminated the Cherokee and the Probe with his headlights and transmitted a request for additional support. When Holsey exited the Cherokee "very quickly," the officer turned on his blue police lights, exited his own vehicle, drew his service weapon, and twice commanded Holsey to raise his hands. Holsey failed to comply, began looking around as though searching for an escape route, and, after the officer threatened to shoot, Holsey finally raised his hands. The officer then commanded Holsey to lie prone on the ground. When the chief deputy sheriff arrived less than two minutes later, he confirmed that the Probe's license plate number matched the number from the victim's radio call and discovered a fresh bullet hole in the back of the Probe. He then awakened and interviewed the occupants of the residence. The occupants, Holsey's sister and another woman who was the owner of the Probe, both stated that Holsey had borrowed the vehicle that night. The chief deputy then, less than fifteen minutes after Holsey was initially detained, asked Holsey his name and placed him under arrest.

Clothes matching the description of those worn by the armed robbery perpetrator were discovered nearby. Shoes removed from Holsey after his arrest matched the description given by witnesses to both the armed robbery and the murder. A sample of blood taken from one of the shoes proved through DNA analysis to be consistent with the blood of the victim.

1. We find that the evidence introduced at trial, viewed in the light most favorable to the verdict, was sufficient to support the jury's finding beyond a reasonable doubt that Holsey was guilty of the crimes of which he was convicted and to support the jury's finding beyond a reasonable doubt the existence of the four statutory aggravating circumstances.[2]

2. Holsey argues that the trial court impermissibly excused nine prospective jurors who all were full-time college students attending colleges and universities outside of the county. The trial court examined each of the students individually in order to assess the

---

[2] *Jackson v. Virginia*, 443 U.S. 307 (99 SC 2781, 61 LE2d 560) (1979).

degree to which they would be burdened by jury service in Holsey's one to two week trial. From our review of the record, we conclude that the trial court properly considered each student's individual circumstances in light of the trial's expected length and made a finding that each would suffer an extraordinary hardship if forced to serve. Such an individualized review, as opposed to a blanket, indiscriminate excusal of all college students without regard for the particular hardship each will bear, is consistent with this Court's interpretation of OCGA § 15-12-1.[3]

3. Holsey contends that the trial court erred by refusing to strike for cause Juror Knight on the basis that her brother-in-law and his girlfriend had been murdered in 1981. Although the juror described how the murders had caused her to view the death penalty with increased favor, she indicated that she would consider all sentencing options in light of the evidence. She also expressed some uncertainty as to whether she could actually vote as a juror to impose the death penalty.

Holsey also contends that, given the fact that he was charged with murdering a law enforcement officer, the trial court erred by refusing to strike Juror Knight for cause on the basis that she had family members who had worked in law enforcement. However, the juror plainly stated that her family members' former employment in law enforcement would not affect her deliberations in Holsey's case. Our review of the trial court's voir dire of the juror reveals adequate support for the trial court's finding that she was capable of serving as an impartial juror and of considering all the sentencing options available under Georgia law.[4]

4. Holsey contends that the state exercised its peremptory strikes in a race-conscious manner in violation of *Batson v. Kentucky*.[5] The panel of forty-two qualified jurors was comprised of nine African-American persons (21%). The state used its ten peremptory strikes to remove two African-American persons (20%) and eight Caucasian persons (80%) from the panel, and the jury consisted of seven African-American persons (58%) and five Caucasian persons (42%). The trial court assumed that Holsey made a prima facie case of discriminatory intent and required the state to set forth a "race-neutral, case-related, clear and reasonably specific explanation for the exercise of the peremptory strike[s]."[6]

One of the two African-American jurors stricken by the state,

---

[3] *Thornton v. State*, 264 Ga. 563, 575 (449 SE2d 98) (1994).

[4] *DeYoung v. State*, 268 Ga. 780, 784 (493 SE2d 157) (1997); *Carr v. State*, 267 Ga. 547, 553-554 (480 SE2d 583) (1997).

[5] 476 U.S. 79 (106 SC 1712, 90 LE2d 69) (1986).

[6] *Turner v. State*, 267 Ga. 149, 151 (476 SE2d 252) (1996).

Juror Atwater, responded to the trial court's initial voir dire questioning by stating that she was conscientiously opposed to the death penalty. The second African-American juror stricken by the state, Juror Clayton, stated that she had had three children die in three different and extremely tragic incidents. When asked whether her children's deaths would affect her as a jury member, Juror Clayton answered negatively but added, "I feel for everybody." The record suggests that Juror Clayton became emotional during the questioning about her children and about the death penalty.

Based on the explanations presented by the state and based upon our review of the record, we conclude that the trial court did not err in finding that Holsey has failed to carry his burden of persuasion as to his allegation of discriminatory intent.[7]

5. Holsey contends that his constitutional rights were violated when, outside of his presence, the jury went to the Jet Food Store where the robbery took place. Holsey concedes that his presence was not mandatory if the jury view was merely a scene view.[8] However, the record demonstrates that the planned scene view was transformed into an evidentiary view[9] when jurors asked questions about the location of video surveillance equipment and whether the lottery machine was in the same location as it was on the night of the crime. The clerk who was working in the store at the time answered the question about the camera. This clerk was unidentified on the record and was not sworn. The trial judge answered the question about the lottery machine's location, with the agreement of defense counsel, but without the knowledge or agreement of the defendant.

The Georgia courts have stringently enforced the right of a criminal defendant under the Georgia Constitution to be present at all aspects of the trial.[10] This Court has consistently considered the defendant's absence from a critical part of the trial as a defect not subject to harmless error analysis.[11] We have no difficulty concluding

---

[7] *Turner*, 267 Ga. at 151.

[8] *Jordan v. State*, 247 Ga. 328, 343-346 (276 SE2d 224) (1981).

[9] Id.

[10] Ga. Const. Art. I, Sec. I, Par. XII; *Brooks v. State*, 271 Ga. 456 (519 SE2d 907) (1999).

[11] *Brooks v. State*, 271 Ga. at 457 (defendant's absence from in-chambers conferences involving jury selection); *Wilson v. State*, 212 Ga. 73, 75-78 (90 SE2d 557) (1955) and *Tiller v. State*, 96 Ga. 430 (23 SE 825) (1895) (defendant's absence during portion of prosecutor's argument); *Rider v. State*, 195 Ga. 656, 659-662 (25 SE2d 304) (1943) (defendant's absence during recharge of the jury); *Hopson v. State*, 116 Ga. 90, 91 (42 SE 412) (1902) (same); *Wilson v. State*, 87 Ga. 583 (13 SE 566) (1891) (same); *Bonner v. State*, 67 Ga. 510 (1881) (same); *Chance v. State*, 156 Ga. 428, 430-433 (119 SE 303) (1923) (defendant's absence during jury view of a car that had been admitted into evidence). Compare *Pennie v. State*, 271 Ga. 419 (520 SE2d 448) (1999) (when defendant was absent from a colloquy between a juror and the judge in the presence of both counsel regarding a spectator's greeting of the juror when they passed in the hallway, state did not overcome presumption of prejudice).

that the taking of testimony is a critical part of the trial at which the defendant has the right to be present.[12] However, the Court has also stated that a defendant may later acquiesce in proceedings occurring in his absence.[13]

The record demonstrates that when the trial reconvened the Monday after the jury trip to the food store, the defendant began his case. After Holsey had called several witnesses and the jury had taken a break, the trial court raised the issue of the jury's questions at the food store. During this discussion, the trial court stated that the store clerk had pointed to the camera and had spoken to the jurors about it. Holsey's counsel made no objection and Holsey remained silent as well. Therefore, we conclude that Holsey acquiesced in the proceedings that occurred at the food store in his absence.

6. Holsey argues that blood evidence obtained from his shoe as a result of his detention and arrest should have been suppressed at trial because the officer lacked probable cause to seize him. While probable cause is required for a warrantless arrest, a person may be lawfully seized for purposes of a brief investigation when only a reasonable and articulable suspicion exists.[14]

What is intended to be an investigatory detention can be transformed into a de facto arrest by the means of detention employed.[15] However, a law enforcement officer who detains a person for purposes of investigation should "not be denied the opportunity to protect himself from attack by a hostile suspect"[16] and may lawfully detain the person in a manner "reasonably necessary to protect [his] personal safety and to maintain the status quo."[17] Other courts have held that, in sufficiently dangerous circumstances, law enforcement officers may effect and maintain investigatory detentions by drawing weapons[18] and forcing defendants to lie face down with arms and legs spread.[19] Such methods must be reserved for cases where plausible danger exists to the detaining officer's personal safety, but "[t]o require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio*. . . ."[20]

---

[12] See *Wade v. State*, 12 Ga. 25, 29 (1852).

[13] *Harwell v. England*, 234 Ga. 640, 641 (217 SE2d 154) (1975). See also *Hudson v. State*, 250 Ga. 479, 483-484 (299 SE2d 531) (1983) (defendant acquiesced in counsel's waiver of jury of 12 by not objecting during trial after one juror was excused).

[14] *Terry v. Ohio*, 392 U.S. 1, 26-27 (88 SC 1868, 20 LE2d 889) (1968).

[15] See *Florida v. Royer*, 460 U.S. 491, 502-503 (103 SC 1319, 75 LE2d 229) (1983).

[16] *Adams v. Williams*, 407 U.S. 143, 146 (92 SC 1921, 32 LE2d 612) (1972).

[17] *United States v. Hensley*, 469 U.S. 221, 235 (105 SC 675, 83 LE2d 604) (1985).

[18] See, e.g., *United States v. Aldridge*, 719 F.2d 368, 371-372 (11th Cir. 1983); *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir. 1982).

[19] *United States v. Jacobs*, 715 F.2d 1343, 1346 (9th Cir. 1983) (per curiam).

[20] *United States v. Malaska*, 501 F.2d 208, 213 n.10 (5th Cir. 1974).

Viewing the detention within the totality of its circumstances, we conclude that the means of the detention were reasonable and did not transform the investigatory stop into an arrest in light of the danger inherent in approaching and detaining an uncooperative person suspected of committing armed robbery and shooting a law enforcement officer.[21] After learning that Holsey had been in possession of the Ford Probe that evening, law enforcement officers possessed probable cause, and, therefore, his warrantless arrest at the conclusion of the fifteen minute investigation did not violate his Fourth Amendment rights.[22] Because Holsey's initial detention and his ultimate arrest did not violate his Fourth Amendment rights, the evidence obtained as a result of the detention and arrest was admissible.

7. The state presented scientific evidence showing that blood found on one of Holsey's shoes was consistent with the victim's blood. Holsey argues that this evidence should have been excluded because the chain of custody of his shoes was inadequately maintained. We agree that the blood-stained shoe was subject to the chain of custody requirement,[23] but our review of the testimony reveals that the chain of custody was adequately demonstrated by the state at trial.[24] Holsey also challenges the chain of custody for his clothing. However, the items of clothing, which had no blood splatters, were distinct and identifiable physical objects. Therefore, a showing of chain of custody regarding the clothing was unnecessary.[25]

8. Holsey argues that a tape-recorded radio transmission by the victim reporting the license plate number of the red Ford Probe was not admissible under the necessity exception to the hearsay rule because the state made no showing at trial that the hearsay statement was more probative than other available evidence.[26] The record reflects, however, that the officer's transmission of the license plate number was the most probative evidence connecting Holsey's car to the shooting.

Holsey also argues that the trial court erred in admitting the tape recording because it contained additional statements by the dispatcher and other officers. The state does not contend that these statements meet the necessity exception. Although a number of statements audible on the tape recording were inadmissible because they explained conduct that was not relevant to any issue in the case,

---

[21] See *Jacobs*, 715 F.2d at 1345-1346; *Aldridge*, 719 F.2d at 371-372.

[22] See *Michigan v. Summers*, 452 U.S. 692, 700 (101 SC 2587, 69 LE2d 340) (1981).

[23] See *Johnson v. State*, 271 Ga. 375, 382 (519 SE2d 221) (1999).

[24] Id.

[25] *Harper v. State*, 251 Ga. 183, 185 (304 SE2d 693) (1983).

[26] *Chapel v. State*, 270 Ga. 151, 155 (510 SE2d 802) (1998).

we conclude beyond a reasonable doubt that none of the inadmissible statements audible on the tape recording harmed Holsey at trial.[27]

9. We conclude that the trial court did not abuse its discretion in denying the motion to sever the charge of armed robbery from the charges of malice murder and felony murder.[28]

10. The trial court denied Holsey's request for a jury charge on voluntary manslaughter. A charge on voluntary manslaughter would have been required if there had been any evidence, however slight, to support a finding by the jury that the elements of that offense had been proved.[29] Testimony that a uniformed officer approached the vehicle with his gun in his hands is not sufficient evidence to support a charge of voluntary manslaughter.[30] Additionally, no reasonable juror could have inferred that Holsey had shot the victim "solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person"[31] from testimony that an unidentified person stated "no" and "stop" immediately before any shots were fired. Consequently, we conclude that the trial court did not err in denying the request for a charge on voluntary manslaughter.

11. The trial court did not err by refusing to allow Holsey to present evidence regarding the nature of death by electrocution during the sentencing phase of his trial.[32]

12. This Court has previously held that execution by electrocution is not unconstitutional.[33]

13. We find that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor.[34] We also find, considering both the crime and the defendant, that the sentence of death was neither excessive nor disproportionate to the penalties imposed in similar cases.[35] The cases listed in the Appendix support the imposition of the death penalty in this case in that they involve the intentional killing of a peace officer engaged in official duties.

---

[27] *Chapman v. California*, 386 U.S. 18 (87 SC 824, 17 LE2d 705) (1967).

[28] *Davis v. State*, 263 Ga. 5, 6 (426 SE2d 844) (1993).

[29] *Raines v. State*, 247 Ga. 504 (1) (277 SE2d 47) (1981); OCGA § 16-5-2 (a) ("A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he [or she] acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. . . .").

[30] *State v. Alvarado*, 260 Ga. 563, 564 (397 SE2d 550) (1990).

[31] OCGA § 16-5-2 (a).

[32] *Smith v. State*, 270 Ga. 240, 250 (510 SE2d 1) (1998).

[33] *Perkins v. State*, 269 Ga. 791, 795 (505 SE2d 16) (1998); *DeYoung v. State*, 268 Ga. at 786; *Wellons v. State*, 266 Ga. 77, 91 (463 SE2d 868) (1995).

[34] OCGA § 17-10-35 (c) (1).

[35] OCGA § 17-10-35 (c) (3).

*Judgment affirmed. All the Justices concur, except Benham, C. J., who concurs in judgment only as to Division 11 and Sears, J., who concurs in part and dissents in part.*

SEARS, Justice, concurring in part and dissenting in part.

I concur in the majority's affirmance of appellant's adjudication of guilt. However, for the reasons explained in my partial concurrence and partial dissent in *Wilson v. State*,[36] I would stay ruling on the constitutionality of appellant's sentence of death by electrocution until receiving guidance from the United States Supreme Court on that issue.[37]

APPENDIX.

*Speed v. State*, 270 Ga. 688 (512 SE2d 896) (1999); *Henry v. State*, 269 Ga. 851 (507 SE2d 419) (1998); *Davis v. State*, 263 Ga. 5 (426 SE2d 844) (1993); *Hill v. State*, 250 Ga. 277 (295 SE2d 518) (1982); *Wallace v. State*, 248 Ga. 255 (282 SE2d 325) (1981); *Stevens v. State*, 247 Ga. 698 (278 SE2d 398) (1981); *McClesky v. State*, 245 Ga. 108 (263 SE2d 146) (1980); *Collier v. State*, 244 Ga. 553 (261 SE2d 364) (1979).

DECIDED DECEMBER 2, 1999 —
RECONSIDERATION DENIED DECEMBER 20, 1999.

*Stephen N. Hollomon, Charlotta Norby, Brenda H. Trammell,* for appellant.

*Fredric D. Bright, District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Allison B. Goldberg, Assistant Attorney General*, for appellee.

---

[36] 271 Ga. 811, 824 (525 SE2d 339) (1999).

[37] In all capital cases, this Court is obligated to undertake a sua sponte review of the death sentence to determine, among other things, whether the penalty is excessive. OCGA § 17-10-35. "This penalty question is one of cruel and unusual punishment, and is for the court to decide" in all cases. *Blake v. State*, 239 Ga. 292, 297 (236 SE2d 637) (1977).