S10A1034. FAIR v. THE STATE.
S10A1035. JOLLY v. THE STATE.
(702 SE2d 420)

MELTON, Justice.

This is the second interim appellate review of two related cases in which the State seeks the death penalty. See *Fair v. State*, 284 Ga. 165 (664 SE2d 227) (2008). Antron Dawayne Fair and Damon Antwon Jolly are co-indictees who were originally charged with one count of malice murder and three counts of felony murder in connection with the shooting death of Bibb County Deputy Joseph Whitehead while he was on assignment as an investigator with the Middle Georgia Drug Task Force. The State contends that both defendants opened fire on Deputy Whitehead as he and other members of the Task Force and the Bibb County Drug Unit were executing a "no-knock" warrant in the early morning hours of March 23, 2006.

After this Court decided certain issues in their cases on interim review, see id., Fair and Jolly were jointly re-indicted on a thirty-four-count indictment that includes one malice murder count and five felony murder counts. Pursuant to OCGA § 17-10-35.1, we granted their second applications for interim review to consider whether the trial court erred in denying their motions to declare unconstitutional the statutory aggravating circumstance described

---

in OCGA § 17-10-30 (b) (8) and in ruling that the immunity from prosecution prescribed by OCGA § 16-3-24.2 could not apply to their cases because the officers' entry was in fact lawful. We also directed the parties in Fair's case to address whether the trial court erred in conducting hearings in Fair's absence and without obtaining a valid waiver from Fair and in denying Fair's motion regarding an alleged conflict of interest arising from the fact that both Fair and Jolly are represented by employees of the Office of the Georgia Capital Defender. For the reasons that follow, we affirm in part, reverse in part, vacate in part, and remand with direction.

1. In the defendants' first interim review, we directed the parties to address whether the trial court erred in denying the defendants' requests that the jury be charged in any sentencing phase that the State bears the burden to prove beyond a reasonable doubt that the defendants knew that the victim was a peace officer engaged in the performance of his duties at the time of the shooting in order to prove the sole statutory aggravating circumstance alleged by the State in its notice of intent to seek the death penalty, namely, that " '[t]he offense of murder was committed against a peace officer while he was engaged in the performance of his official duties.' " *Fair*, 284 Ga. at 167 (2) (b). See OCGA § 17-10-30 (b) (8). The defendants' motions in the trial court focused on the question of whether the principles of statutory construction dictated a conclusion that the (b) (8) statutory aggravating circumstance required proof that the defendant knew that the victim was a police officer, and the trial court did not rule on the constitutionality of the statute.

In their briefs to this Court, the defendants also focused their arguments on statutory construction. Nevertheless, at oral arguments the defendants argued the constitutionality of the statute if this Court construed it so as not to require scienter. However, this Court will not pass upon the constitutionality of a statute "unless it clearly appears that the point was directly and properly made in the court below *and distinctly passed on by the trial judge.*" *In re Boult*, 227 Ga. 564, 564 (181 SE2d 821) (1971) (citation and punctuation omitted). See also *Alexander v. State*, 239 Ga. 810, 810 (239 SE2d 18) (1977). Therefore, while noting that there was no constitutional issue before us, *Fair*, 284 Ga. at 169 (2) (b), we applied principles of *statutory* construction to "construe the (b) (8) circumstance as not requiring knowledge on the part of the defendant that the victim was a peace officer or other designated official engaged in the performance of his duties." Id. at 170 (2) (b). On remand, the defendants moved the trial court to declare OCGA § 17-10-30 (b) (8) unconstitutional under the federal and state constitutions. The trial court denied the defendants' equal protection challenge and reserved

ruling on their challenge based on the ban on cruel and unusual punishments.

*A. Equal Protection Challenge.* The defendants contend that the trial court erred in denying their equal protection challenge to the OCGA § 17-10-30 (b) (8) statutory aggravating circumstance. While the defendants make their challenge under the equal protection clauses of both the federal and state constitutions, " '[b]ecause the protection provided in the Equal Protection Clause of the United States Constitution is coextensive with that provided in Art. I, Sec. I, Par. II of the Georgia Constitution of 1983, we apply them as one.' " *Favorito v. Handel*, 285 Ga. 795, 797 (1) (b) (684 SE2d 257) (2009) (citation omitted).

In order to mount a successful equal protection challenge to a statute, a claimant must initially establish that he is similarly situated to members of the class who are treated differently from him. *Reed v. State*, 264 Ga. 466, 466 (448 SE2d 189) (1994). The trial court correctly found that Fair and Jolly are similarly situated to defendants against whom the State seeks the death penalty under one or more of the statutory aggravating circumstances as provided in OCGA § 17-10-30 (b). See *Woodard v. State*, 269 Ga. 317, 321-322 (2) (496 SE2d 896) (1998) (stating that criminal defendants are similarly situated for equal protection purposes only if they are charged with the same crime). Assuming, without deciding, that the trial court was also correct in finding that the (b) (8) circumstance results in different treatment for similarly-situated individuals because it does not require scienter, see *Fair*, 284 Ga. at 179 (Hunstein, P. J., dissenting) (stating that "the other ten statutory aggravating circumstances . . . all appear to require an element in addition to murder of which the defendant, either expressly or impliedly, must have had knowledge"), we conclude that the trial court properly denied the defendants' challenge under the second prong of the evaluation. See *Reed*, 264 Ga. at 467 (explaining that there are two prongs to an evaluation of legislation under an equal protection claim).

If a claimant has established that he is similarly situated to members of the class who are treated differently from him, the statute must next be assessed to determine under what analysis it is tested.

> When assessing equal protection challenges, a statute is tested under a standard of strict scrutiny if it either operates to the disadvantage of a suspect class or interferes with the exercise of a fundamental right. . . . If neither a suspect class nor a fundamental right is affected by the statute, the statute need only bear a rational relationship to some legitimate state purpose.

*Barnett v. State*, 270 Ga. 472, 472 (510 SE2d 527) (1999) (citations and punctuation omitted).

The defendants do not contend that they are members of a suspect class. Both defendants do contend, however, that the (b) (8) circumstance interferes with a fundamental right, the right to life, because if a defendant is convicted of murder and in the sentencing phase the jury trying his case finds beyond a reasonable doubt the presence of the (b) (8) circumstance with regard to his case, the jury is authorized to recommend a death sentence for that defendant. See OCGA § 17-10-30 (b) (8), (c). Therefore, Fair and Jolly maintain that strict scrutiny analysis is applicable and, accordingly, that the trial court erred in applying rational basis analysis instead. The defendants further contend that the trial court's alleged error resulted from its reliance on case law involving equal protection challenges by defendants who, unlike them, had already been convicted and sentenced to death and who, therefore, no longer possessed a fundamental right to life.

The trial court did not err, however, in refusing to apply strict scrutiny analysis in considering the defendants' equal protection challenge on the basis that the *punishment* prescribed by the criminal statute involves an interference with a fundamental right. The relevant inquiry in deciding whether strict scrutiny analysis or rational basis analysis applies to determine whether a criminal statute violates equal protection rights is not whether the punishment the criminal statute prescribes interferes with a fundamental right, but whether the behavior proscribed or regulated by the statute itself involves a fundamental right. See *Barnett*, 270 Ga. at 472 (holding that the DUI statute setting forth a blood alcohol concentration standard different for persons under age 21 than for persons above age 21 where there exists a statutory presumption that persons are deemed not to be under the influence of alcohol was subject to rational basis analysis, because "[d]riving a vehicle under the influence of any amount of alcohol is not a fundamental right").

Furthermore, as to any argument that a higher level of scrutiny is required simply because a defendant's potential punishment is the death penalty, we find persuasive the Fifth Circuit's reasoning that *Gregg v. Georgia*, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976), teaches otherwise. As the Fifth Circuit explained:

> In *Gregg*, the Supreme Court stressed, in the context of the death penalty, the deference which a court should give a legislature's judgment. [Cit.] . . . Because of the complexity of determining the need for the death penalty, the Court found that the decision to authorize capital punishment for some classes of crimes was one that was best left to the

legislature unless "clearly wrong." [Cit.] Although the issue in *Gregg* was whether the legislature's decision to impose the death penalty violated the eighth amendment because of the severity of the punishment, the degree of deference which the Court's "clearly wrong" test accorded the legislative judgment convinces us that the . . . equal protection clause[ ] do[es] not require a higher level of scrutiny for legislative classifications that may result in the death penalty.

*Gray v. Lucas*, 677 F2d 1086, 1104 (V) (5th Cir. 1982) (holding that a defendant's equal protection challenge to Mississippi's death penalty statute was properly assessed under a rational basis analysis).

Because the relevant inquiry in determining what analysis to apply is not whether the *punishment* resulting from a violation of the statute interferes with a fundamental right, the defendants' contention that the fact that they have not been convicted and sentenced to death and, thus, still possess a fully-intact fundamental right to life is irrelevant to determining what analysis applies. What is relevant is the behavior that the (b) (8) circumstance proscribes, which is the murder of "any peace officer, corrections employee, or firefighter while engaged in the performance of his official duties." OCGA § 17-10-30 (b) (8). Therefore, the proper inquiry is whether that behavior involves a fundamental right. The obvious answer is that it does not.

" 'Since the statute does not disadvantage a suspect class or interfere with the exercise of a fundamental right, it need only bear a reasonable relationship to a legitimate state purpose. (Cits.)' [Cit.]" *Barnett*, 270 Ga. at 472. Under a rational basis analysis, "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U. S. 420, 426 (I) (81 SC 1101, 6 LE2d 393) (1961). "If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U. S. 471, 485 (II) (90 SC 1153, 25 LE2d 491) (1970) (citation and punctuation omitted).

The legislative intent behind omitting a knowledge requirement from OCGA § 17-10-30 (b) (8) was to protect peace officers by providing as a sentencing option the severest form of punishment for anyone who murders a peace officer or other designated official while in the performance of his official duties. See *Fair*, 284 Ga. 169 (2) (b) (holding that "[i]t is logical to conclude that the General Assembly purposely" omitted a knowledge requirement from the (b) (8) circumstance, because "[a] contrary conclusion would in some cases

prevent the imposition of the death penalty for the murder of an officer enforcing an unpopular law and would wholly preclude that punishment for the murder of an 'agent acting under cover,' " and noting that " 'legitimate conduct [does not] become[ ] unlawful solely because of the identity of the [victim]' " but that " 'the offender takes his victim as he finds him' ") (quoting *United States v. Feola*, 420 U. S. 671, 684 (II) (95 SC 1255, 43 LE2d 541) (1975) (involving a statute that prohibited assault on a federal officer and did not require proof of knowledge that the intended victims were federal officers)).

The United States Supreme Court has recognized that "the life of a police officer is a dangerous one," *Roberts v. Louisiana*, 431 U. S. 633, 636, n. 3 (97 SC 1993, 52 LE2d 637) (1977), and that society has "a special interest in affording protection to these public servants who regularly risk their lives in order to guard the safety of other persons and property." Id. at 636 (footnote omitted). Undercover officers operate at an even further heightened risk to their safety. See Note and Comment: *Closing the Courtroom for Undercover Police Witnesses: New York Must Adopt a Consistent Standard*, 4 J. L. & Pol'y 659, 680 (1996) (listing several reasons why officers working in undercover operations targeted at illegal drug trafficking are placed at significant risk). However, "[u]ndercover operations are an indispensable tool for effective law enforcement[,] . . . [a]s . . . 'many crimes . . . could not otherwise be detected.' " Note: *Economics, Causation, and the Entrapment Defense*, 2001 U. Ill. L. Rev. 1207, 1245 (2001) (quoting *United States v. Russell*, 411 U. S. 423, 445 (93 SC 1637, 36 LE2d 366) (1973) (Stewart, J., dissenting)).

The only surviving witness to the murder of a plain-clothes or undercover officer could well be the perpetrator himself. In such a case, the murdered officer would not be available to testify that he identified himself as an officer to the defendant, who would be unlikely to admit that he knew that he was killing an officer. Because the (b) (8) circumstance does not require scienter, however, a defendant may face a possible death sentence if he kills a peace officer regardless of whether there is anyone to testify that the officer identified himself to the defendant before the killing. The awareness of that possibility will serve to deter at least some prospective offenders. See *Cheeley v. Henderson*, 261 Ga. 498, 503 (405 SE2d 865) (1991) ("Everyone is presumed to know the law. . . ."). The deterrence of crimes by prospective offenders is a legitimate societal purpose served by the death penalty. See *Gregg*, 428 U. S. at 183-187 (III) (C). Thus, providing the death penalty as a sentencing option for the murder of a peace officer serves two legitimate societal purposes. It deters the crime of murder of peace officers, which, in turn, results in the protection of those officers.

The above situation constitutes a "state of facts" that "reasonably may be conceived to justify" the classification created by the (b) (8) circumstance. *McGowan*, 366 U. S. at 426. Therefore, we conclude that the (b) (8) circumstance bears a rational relationship to the legitimate state purposes of providing deterrence of possible harm to peace officers and, thus, of protecting officers. Accordingly, the trial court did not err in holding that the (b) (8) statutory aggravating circumstance does not violate equal protection.

*B. Ban on Cruel and Unusual Punishments Challenge.* The defendants argue that not requiring scienter in the (b) (8) statutory aggravating circumstance also violates the ban on cruel and unusual punishments under the state and federal constitutions. See U. S. Const., Amend. VIII; Ga. Const. of 1983, Art. I, Sec. I, Par. XVII. See also *Fleming v. Zant*, 259 Ga. 687, 690 (3) (386 SE2d 339) (1989) (recognizing that "[f]ederal constitutional standards represent the minimum, not the maximum, protection that this state must afford its citizens"). The trial court did not err in declining to rule on this issue pre-trial, because it is "the sentence actually imposed, not a potentially greater sentence, which must be subjected to this constitutional scrutiny." *Lambeth v. State*, 257 Ga. 15, 16 (354 SE2d 144) (1987). Accordingly, this constitutional issue is not ripe for review. See *Pimper v. State of Ga.*, 274 Ga. 624, 627 (555 SE2d 459) (2001) (holding that this Court was without jurisdiction to consider constitutional issues "not ruled upon by the trial judge after having been raised in the trial court").

*C. The Trial Court's Proposed Submission of a Special Interrogatory.* Because the (b) (8) statutory aggravating circumstance does not require knowledge on the part of the defendant that the victim was a peace officer or other designated official engaged in the performance of his official duties, see *Fair*, 284 Ga. at 170 (2) (b); OCGA § 17-10-30 (b) (8), the trial court erred in ruling that, if the jury in either defendant's case returned a sentence other than life with the possibility of parole, the jurors in that case would be asked to answer a special interrogatory on the question of the defendant's knowledge of the victim's status as a peace officer. Compare *Weatherspoon v. K-Mart Enterprises of Ga., Inc.*, 149 Ga. App. 424, 427 (1) (254 SE2d 418) (1979) (finding no error in the trial court's submission of interrogatories to the jury where "[t]he interrogatories were responsive to the facts and issues"). Accordingly, we reverse that portion of the trial court's order directing that such an interrogatory be submitted to the jury.

2. Both Fair and Jolly filed motions to dismiss their murder prosecutions under OCGA § 16-3-24.2, which creates a criminal immunity from prosecution for persons using threats or force in accordance with the statutes defining justification in the use of force

in defense of self and others, in defense of habitation, and in defense of property other than a habitation. See OCGA §§ 16-3-21, 16-3-23, and 16-3-24. After conducting hearings on the defendants' motions during which the parties presented extensive testimony and evidence, the trial court reserved its ruling in both defendants' cases, stating that it would not rule on the issue until the close of evidence at trial. In the first interim review of these cases, we directed the trial court to rule on the issue of immunity pre-trial. See *Fair*, 284 Ga. at 165-166 (1) (holding that " 'the decision as to whether a person is immune under OCGA § 16-3-24.2 must be determined by the trial court [as a matter of law] before the trial of that person commences' ") (quoting *Boggs v. State*, 261 Ga. App. 104, 106 (581 SE2d 722) (2003)).

After the return of jurisdiction from this Court, the trial court ruled on the defendants' motions.[1] In doing so, the trial court found that a defendant may claim immunity, "if and only if, he is responding to an 'unlawful' force." The trial court reasoned that Deputy Whitehead's use of force when he entered the dwelling "was necessarily lawful," because the trial court had previously found and this Court had affirmed that the issuance and time and manner of execution of the "no-knock" warrant that the officers were executing were legal. See *Fair*, 284 Ga. at 170-174 (3) (a)-(c). Therefore, the trial court concluded, because the defendants responded with deadly force to a *lawful* force, i.e., the officers' lawful entry, they did not fall within the limited confines of OCGA § 16-3-24.2 and, thus, were not immune from prosecution. The defendants contend that the trial court erred in its application of OCGA § 16-3-24.2, because it misconstrued the language of OCGA § 16-3-23 (defining when an actor is justified in using force in defense of habitation) to mean that the defense was only available in situations in which the victim's entry was actually unlawful.[2]

---

[1] Fair asserts that the trial court denied his motion to invoke immunity from prosecution pursuant to OCGA § 16-3-24.2 without a hearing. However, our review of the records and transcripts in these cases shows that the trial judge originally assigned to the defendants' cases held thorough evidentiary hearings on the immunity issue prior to the first interim review and that, after the return of jurisdiction to the trial court, both defendants acknowledged on the record to the trial judge now assigned to the cases that the trial court had already held evidentiary hearings on this issue, that there was no new evidence to present, and that the issue could be decided on the current record. Accordingly, after conducting non-evidentiary hearings and hearing argument on the issue in each defendant's case and after considering the records in the cases, the trial court entered orders determining the issue of immunity pre-trial pursuant to this Court's directive. See *Fair*, 284 Ga. at 166 (1).

[2] The trial court addressed whether the defendants were immune from prosecution through the application of OCGA §§ 16-3-21, 16-3-23, and 16-3-24 and denied the defendants' motions to dismiss under all three statutes because Deputy Whitehead's "use of force when he entered the house" was lawful. However, the defendants have only appealed the trial court's application of OCGA § 16-3-23.

The cardinal rule of statutory construction is to seek the intent of the Legislature, and language in one part of a statute must be construed "in the light of the legislative intent as found in the statute as a whole." *Goldberg v. State*, 282 Ga. 542, 544 (651 SE2d 667) (2007) (citation and punctuation omitted). In determining the Legislature's intent, we must first focus on the statute's text. *Busch v. State*, 271 Ga. 591, 592 (523 SE2d 21) (1999). "In order to discern the meaning of the words of a statute, [we] must look at the context in which the statute was written, remembering at all times that 'the meaning of a sentence may be more than that of the separate words. . . .' [Cit.]" Id.

> In addition, [in] interpreting a statute, we must pre-
> sume that the General Assembly had full knowledge of the
> existing state of the law and enacted the statute with
> reference to it. We construe statutes "in connection and in
> harmony with the existing law, and as a part of a general
> and uniform system of jurisprudence," and "their meaning
> and effect is to be determined in connection, not only with
> the common law and the constitution, but also with refer-
> ence to other statutes and decisions of the courts."

*Chase v. State*, 285 Ga. 693, 695-696 (2) (681 SE2d 116) (2009) (citations omitted).

With those principles in mind, we turn first to the text of the statute, which provides the following:

> A person is justified in threatening or using force
> against another when and to the extent that he or she
> reasonably believes that such threat or force is necessary to
> prevent or terminate such other's unlawful entry into or
> attack upon a habitation; however, such person is justified
> in the use of force which is intended or likely to cause death
> or great bodily harm only if:
> (1) The entry is made or attempted in a violent and
> tumultuous manner and he or she reasonably believes that
> the entry is attempted or made for the purpose of assaulting
> or offering personal violence to any person dwelling or being
> therein and that such force is necessary to prevent the
> assault or offer of personal violence;
> (2) That force is used against another person who is not
> a member of the family or household and who unlawfully and
> forcibly enters or has unlawfully and forcibly entered the
> residence and the person using such force knew or had
> reason to believe that an unlawful and forcible entry oc-
> curred; or

(3) The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

OCGA § 16-3-23.

Under the trial court's interpretation of the statute, the term "reasonably believes" and, thus, the reasonable belief standard,[3] in the introductory clause of the statute applies only to an actor's perception of the amount of force necessary to prevent or terminate another's unlawful entry or attack; consequently, the entry or attack itself must have been *in fact* unlawful, regardless of what a defendant might have believed, in order for the statute to apply. Therefore, because Deputy Whitehead's entry was not unlawful, the trial court never considered whether the defendants were justified in using "force which is intended or likely to cause death or great bodily harm" ("deadly force") under subsections (1), (2), or (3).

*A. Fair's Argument.* While both defendants contend that the trial court erred in interpreting the statute, their arguments differ. Fair maintains that, under a natural reading of the statute, the "reasonable belief" standard also applies with respect to the unlawful entry or attack element in the introductory clause. Specifically, Fair contends that the language in subsection (2) requiring that an intruder "unlawfully and forcibly entered the residence" evidences the Legislature's clear intent that a reasonable belief standard apply to the unlawful entry or attack element in the introductory clause of the statute and, thus, that the entry or attack need not actually be unlawful in order for subsections (1) or (3) to apply. Fair argues that, if the Legislature had intended to include a requirement that the entry must in fact be unlawful in the introductory clause, there would have been no need for the limiting language in subsection (2) that the deadly force must be used against a person who "has unlawfully and forcibly entered the residence," in which case that language in subsection (2) would be mere surplusage.

The introductory clause, when read in isolation, might be construed to apply a reasonable belief standard with respect to the unlawful entry or attack element. We reject that interpretation, however, because we conclude that it is not supported by a reading of the statute as a whole, would thwart the Legislature's purpose in enacting the statute, and would alter both the well-established

---

[3] See OCGA § 16-1-3 (16) (stating that, as used in Title 16, the term " '[r]easonable belief' means that the person concerned, acting as a reasonable man, believes that the described facts exist").

common law principle and the long-standing precedent of this State's appellate courts that generally the use of force in defense of habitation is justified only where there is an *unlawful* entry.

*(1) History of OCGA § 16-3-23.* "[T]he early common law rule [of defense of habitation] . . . allowed for deadly force to be used to prevent an imminent and unlawful entry of the dwelling[.]" Catherine L. Carpenter, *Of the Enemy Within, the Castle Doctrine, and Self-Defense*, 86 Marq. L. Rev. 653, 665, n. 42 (2003) (citing Joshua Dressler, *Understanding Criminal Law*, § 20.03 [B] (3d ed. 2001)). See also Daniel Michael, *Florida's Protection of Persons Bill*, 43 Harv. J. on Legis. 199, 206 (2006) (stating that at common law "deadly force is justified only if the 'breaking and entry [of an unlawful intruder is] . . . with a felonious intent. . . .' ") (quoting 4 William Blackstone, Commentaries on the Laws of England 178 (Wayne Morrison ed., Cavendish Publishing 2001) (1822)). On February 25, 1784, "the Common Laws of England" as they applied to Georgia on May 14, 1776, with certain qualifications, were declared to be of force in this State. Cobb's Digest, p. 721. Georgia's Penal Code of 1833 codified the defense of habitation and the doctrine of reasonable fears in the section defining justifiable homicide. See Laws 1833, Cobb's 1851 Digest, pp. 784-785. "The Penal Code . . . *made no change* in the Common Law of homicide, except . . . that 'excusable homicide' at Common Law [became] 'justifiable' by the Statute." *Monroe v. State*, 5 Ga. 85, 88 (1848). Accord *Pounds v. State*, 43 Ga. 88, 136 (1871).

Under the law as codified, "a forcible attack and invasion on the property or habitation of another" were required to invoke the defense. Cobb's Digest, p. 785. The circumstances were also required to be "sufficient to excite the fears of a reasonable man," and the actor must have "really acted under the influence of those fears, and not in the spirit of revenge." Id. at 784. A review of this Court's case law indicates that, as at common law, the defense was construed as requiring an unlawful entry. See *Rushing v. State*, 135 Ga. 224 (69 SE 171) (1910) (holding that it was not error to refuse a charge on defense of habitation in the prosecution of one charged with killing an officer who at the time was attempting to execute a warrant in his possession). Compare *Giddens v. State*, 154 Ga. 54 (113 SE 386) (1922) (citing the defense of habitation statute in reversing the defendant's murder conviction where he fatally shot a constable after the constable "either kicked in or pushed the door [of the defendant's home] partly open" to effectuate an *unlawful* arrest). This view was in line with established jurisprudence at the time, which held that the rule as to defense of habitation did not apply where the person killed had the right to seek admission to the habitation. See 25 ALR 508 (I) (a) (1) (b) (2) (1923). Thus, the rule

had no application "where a police officer [wa]s shot while lawfully attempting to force an entrance in order to make an arrest." Id. (citing *Rushing*, supra, among other cases).

Although a new criminal code was enacted in 1933, the language of the statutes pertaining to the defense of habitation and the doctrine of reasonable fears remained virtually unchanged for well over a century. See Ga. Code of 1933, §§ 26-1011 through 26-1013. In 1968, the statutes setting forth defenses to criminal liability were rewritten as a part of an act to provide a new Georgia Criminal Code. See Ga. L. 1968, pp. 1249, 1272-1274, enacting Chapter 26-9, "Defenses to Criminal Liability," composed of Code Ann. §§ 26-901 through 26-907. Code Ann. § 26-903 defining when a person is justified in the use of threats or force against another in defense of habitation became OCGA § 16-3-23 with the enactment of the Official Code of Georgia Annotated in 1981. Nevertheless, its provisions remained unchanged until 2001, when the General Assembly amended the statute's language where appropriate to reflect that it was gender neutral, inserted a new subsection (2), and re-labeled the previous subsection (2) as subsection (3). See Ga. L. 2001, p. 1247, § 2. In other words, subsection (2) containing the language Fair relies on to support the interpretation he urges was added to the statute over 30 years after the original statute was passed.

*(2) Prior Case Law.* During the decades prior to the 2001 amendment, decisions of our appellate courts repeatedly held that the defense of habitation statute required an unlawful entry into or attack on the habitation in order for its provisions to apply. See, e.g., *Stobbart v. State*, 272 Ga. 608, 612 (4) (533 SE2d 379) (2000) (stating that "OCGA § 16-3-23 authorizes use of force to terminate an 'unlawful entry into or attack upon a habitation' " and holding that there was no evidence to support a jury charge on defense of habitation where the victim was a guest in the home); *Parrish v. State*, 182 Ga. App. 247, 250 (5) (355 SE2d 682) (1987) (holding that the defendant was not entitled to a directed verdict where "[h]is answer to the charges of aggravated assault and obstruction of officers was defense of habitation, OCGA § 16-3-23," and where there was "*no* evidence that defendant was attempting 'to prevent or terminate (the officers') unlawful entry into or attack upon a habitation' "); *Brown v. State*, 163 Ga. App. 209, 211 (3) (294 SE2d 305) (1982) ("[S]ince the entry by the officers was lawful, the refusal to charge [OCGA § 16-3-23] applicable to unlawful entry was not error" in a prosecution for obstruction where the defendant hindered officers in "hot pursuit" from entering his home after midnight to effect an arrest of another occupant); *Todd v. State*, 149 Ga. App. 574, 574 (2) (254 SE2d 894) (1979) (finding no error in the trial court's failure to charge on the use of force in defense of habitation,

because "[t]he record d[id] not show evidence of an 'unlawful entry, or attack upon,' the appellant's apartment by the decedent"); *Leach v. State*, 143 Ga. App. 598, 600 (2) (239 SE2d 177) (1977) (rejecting the appellant's contention that any action taken by him was in defense of habitation and, thus, that the trial court erred in denying his motion for a directed verdict of acquittal of aggravated assault of a police officer where "there was sufficient evidence for the jury to find either that the officer did not make an unlawful entry or was not attempting to make one"). Furthermore, as previously noted, this State's case law was in line with established jurisprudence. See 40 AmJur2d Homicide, § 171 (stating that an inhabitant cannot rely on the defense of dwelling claim where the victim had the right to seek admission to the habitation, "such as a person seeking to dispossess the accused under a lawful process, or a police officer seeking to make an arrest").

"The General Assembly is presumed to enact all statutes with full knowledge of the existing condition of the law and with reference to it. [Cit.]" *Summerlin v. Georgia Pines Community Svc. Bd.*, 286 Ga. 593, 594 (2) (690 SE2d 401) (2010). We, therefore, presume that the Legislature knew in 2001 when it enacted subsection (2) that the State's appellate courts had repeatedly held that an unlawful entry or attack was a prerequisite to the applicability of the defense of habitation statute. Accordingly, we conclude that the fact that the General Assembly retained virtually unchanged all the other parts of the defense of habitation statute and, particularly, the fact that it did not add a reasonable belief standard to the unlawful entry element in the introductory clause when it inserted subsection (2), evidences its intent to retain the requirement that the entry or attack must in fact be unlawful in order for the use of threats or force to be justified in the defense of habitation.

*(3) Comparison with Other Provisions.* This conclusion is supported by another elementary rule of statutory construction. In construing a statute so as to give effect to the legislative intent, we are constrained to construe the language that Fair points to in support of his position in its context and in "consideration of all the other parts of the statute." *City of Jesup v. Bennett*, 226 Ga. 606, 609 (2) (176 SE2d 81) (1970). The following discussion shows that, when so construed, the Legislature did not simply re-state in subsection (2) the unlawful entry or attack element that is contained in the statute's introductory clause but, rather, delineated those separate elements necessary to justify deadly force under that subsection. Accordingly, the language is not mere surplusage, as Fair alleges. See *Harris v. State*, 286 Ga. 245, 251 (5) (686 SE2d 777) (2009) (stating that a fundamental rule of statutory construction requires the avoidance of a construction that makes some language mere surplusage).

First, it is necessary to note the form of the statute. The statute's introductory clause defines when an actor is justified in the use of *any* force or threats of force in the defense of habitation, namely, "to the extent that he reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation." OCGA § 16-3-23. Therefore, the elements set forth in the introductory clause, however they are construed, are necessary to justify the use of *any* force or threats of force in defense of habitation in *any* circumstances. Subsections (1), (2), and (3) set forth the *additional* elements necessary to justify the use of *deadly* force in three different contexts.

Although Fair contends that, under the trial court's interpretation, the introductory clause and subsection (2) both contain the same unlawful entry element, subsection (2) actually requires that the entry be both unlawful *and forcible*, while the introductory clause by its plain language requires only that the entry be unlawful. Comparing subsection (2) to the other subsections shows further distinctions. Only "[s]ubsection (2) . . . expressly excludes application of the defense between members of the 'same family or household.'" *Hammock v. State*, 277 Ga. 612, 615 (3) (592 SE2d 415) (2004). Finally, and perhaps most significantly, unlike subsections (1) and (3), subsection (2) does not require an objective reasonable belief that the intruder is entering to assault, to offer personal violence, or to commit a forcible felony and that deadly force is necessary to prevent one of those acts. As a result, subsection (2) provides an actor broader leeway in using deadly force to repel an entry into a "residence" than subsections (1) and (3) provide and, thus, offers broader protection to an actor defending his "residence." OCGA § 16-3-23 (2). This distinction supports a conclusion that the purpose behind adding this third justification defense to the statute was "to make it easier" for "homeowners to use deadly force in protecting their home[s] from an illegal intruder." Derek E. Empie, *Defenses to Criminal Prosecution: Change Provisions Relating to the Use of Force in the Defense of Habitations or Residences; Provide for Related Matters*, 18 Ga. St. U. L. Rev. 25, 25-26 (Fall 2001) (stating that the 2001 amendment, which was prompted by "a rash of home invasions," was proposed "to add a third justification defense that would allow people to defend their home[s] without having to stop and think whether deadly force toward an intruder would meet the . . . reasonableness requirements [in subsections (1) and (3)]").

However, the plain language of the provision also evidences the General Assembly's intent to balance the fact that subsection (2) omits the reasonable belief standard with respect to the intruder's purpose and the amount of force necessary to thwart that purpose by limiting the justification of the use of deadly force to those situations

where a person other than a family or household member "unlawfully and forcibly entered" and the actor "knew or had reason to believe that an unlawful and forcible entry occurred," thereby reining in to some extent the provision's broad application. See Empie, *Defenses to Criminal Prosecution*, 18 Ga. St. U. L. Rev. at 26 (stating that language excluding family and household members was added at the suggestion of legislative counsel so that the defense would not be available in "situations where (one) family member shoots another") (quoting Senator Eric Johnson, who introduced the 2001 amendment in the Senate)). See also *Hammock*, 277 Ga. at 615 (3) (suggesting that the "likely" reason why subsection (2) excludes its application between members of the same family or household is because it does not contain a reasonable belief requirement regarding the intruder's purpose and the amount of force necessary to thwart that purpose).

In enacting subsection (2), the Legislature clearly intended to reconcile two competing interests, that of a resident to react quickly with the use of deadly force in the context of a home invasion and that of society to discourage random or domestic violence. Accordingly, we conclude that the Legislature included the "unlawful and forcible entry" element in subsection (2) in order to make clear that, under that subsection, the entry must still in fact be unlawful, as well as forcible, even though an actor "could be justified in using deadly force under subsection (2) based on 'mere knowledge or belief' about the unlawfulness or forcefulness of the entry instead of the reasonable belief that the person entering did so for the purpose of committing a felony." Robert Christian Rutledge, *Vigilant or Vigilante? Procedure and Rationale for Immunity in Defense of Habitation and Defense of Property Under the Official Code of Georgia Annotated §§ 16-3-23, -24, -24.1, and -24.2*, 59 Mercer L. Rev. 629, 642 (Winter, 2008) (citation omitted). Thus, the Legislature's inclusion of the "unlawful and forcible entry" element in subsection (2) is not surplusage but part of a statutory scheme "designed to allow an individual to defend his family, home and property in virtually any situation which might arise with respect to an invasion of [a habitation] while at the same time affording maximum protection of human life." *State v. McCombs*, 253 SE2d 906, 911 (297 NC 151) (1979).

We also reject the interpretation urged by Fair because we conclude that construing the statute as applying a reasonable belief standard with respect to the unlawful entry element in the introductory clause would thwart the legislative intent in enacting subsection (2). See *Goldberg*, 282 Ga. at 544. The practical consequence of such an interpretation would be that an actual unlawful entry or attack would not be required under subsections (1) and (3),

resulting in a statutory scheme that would apply less-stringent requirements to justify the use of deadly force for those actors invoking the defense under subsections (1) and (3) than it would apply to an actor invoking the defense under subsection (2), which plainly requires an actual unlawful entry. Consequently, the statute would afford less protection to an actor under subsection (2) than those actors under subsections (1) and (3). That result was clearly not intended by the Legislature, as evidenced by its omission from subsection (2) of the reasonable belief standard with respect to the intruder's purpose and the force necessary to thwart that purpose. See Empie, *Defenses to Criminal Prosecution*, 18 Ga. St. U. L. Rev. at 26 (quoting Representative Curtis Jenkins, Chairman of the House Special Judiciary Committee at the time of the amendment's enactment, as stating that the Legislature's purpose in adding subsection (2) was "to give [the homeowner] more protection"); Robert E. Cleary, Jr., *Kurtz Criminal Offenses and Defenses in Ga.*, "Defense of Property and Habitation," (III), p. 331 (2007 ed.) (stating that subsection (2) "makes it 'easier' for a resident to use deadly force because it contains no reasonableness requirement").

*B. Jolly's Argument.* Jolly argues that the phrase "such other's unlawful entry into *or* attack upon a habitation" in the introductory clause is properly construed as meaning *either* an unlawful entry *or* an attack that need not be unlawful, thereby allowing an exception to the requirement that the entry must in fact be unlawful. (Emphasis supplied.) OCGA § 16-3-23. Because subsection (1) requires that the entry be "violent and tumultuous" but does not state that the entry must be unlawful, he alleges that an unlawful entry is not required in order to justify the use of deadly force under subsection (1). Jolly's proposed interpretation does not follow the natural and reasonable construction of the provision. See *Chase*, 285 Ga. at 695 (2) (stating that, where a statute's language is "plain and susceptible to only one natural and reasonable construction," it must be construed accordingly). Even assuming it did, we would be required to reject such an interpretation for many of the same reasons that we have rejected the interpretation urged by Fair.

Jolly also contends that the application of certain provisions of OCGA §§ 16-3-24.2 and 16-3-23 would violate his equal protection rights. However, the trial court did not apply those provisions in denying his motion. Accordingly, his contentions are moot. Moreover, this Court will not review constitutional questions that were not addressed by the trial court. See *Alexander*, 239 Ga. at 810.

Because we reject the interpretations of OCGA § 16-3-23 urged by Fair and Jolly and conclude that the trial court did not err in denying their motions to dismiss the murder charges against them, this enumeration affords them no relief.

3. Both Fair and the State filed motions to disqualify defense counsel based on an alleged conflict of interest arising from the fact that staff attorneys employed at different branches of the Office of the Georgia Capital Defender are now representing Fair and Jolly. Fair asked that Jolly's lawyers be disqualified, and the State asked that both defendants' lawyers and the entire defense team be disqualified. However, Jolly does not allege that a conflict of interest exists, and he filed no motion to disqualify any lawyers.

The trial court conducted separate hearings in each defendant's case. While one of Fair's attorneys was present and observed the evidentiary hearing in Jolly's case on the State's motion alleging a conflict of interest, that attorney did not participate in the hearing. Furthermore, Fair was absent from the hearing, and Fair's attorney did not indicate that he was personally waiving Fair's right to be present by "his express authority" to do so. *Wilson v. State*, 212 Ga. 73, 77-78 (90 SE2d 557) (1955). After the completion of the evidentiary hearings in both cases, the trial court found that confidential information about Fair's case had not been passed to Jolly's attorneys and ruled that all of the lawyers would be allowed to continue representing their respective defendants.[4] In making its findings, the trial court placed substantial reliance on testimony and evidence presented at the hearing in Jolly's case, i.e., the hearing at which Fair was absent.

Pursuant to Art. I, Sec. I, Par. XII of the Georgia Constitution of 1983, a person accused of a crime in this State has a legal right to be present at all critical stages of his trial. See *Holsey v. State*, 271 Ga. 856, 860 (5) (524 SE2d 473) (1999). The federal constitution also guarantees to a criminal defendant "the 'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" *Tennessee v. Lane*, 541 U. S. 509, 523 (IV) (124 SC 1978, 158 LE2d 820) (2004) (quoting *Faretta v. California*, 422 U. S. 806, 819, n. 15 (95 SC 2525, 45 LE2d 562) (1975)). The evidentiary hearing on the State's motion to disqualify Jolly's attorneys in order to prevent the disclosure of confidential and privileged aspects of Fair's case affected Fair's fundamental rights to independent counsel and to a fair trial. See *Wheat v. United States*, 486 U. S. 153, 161 (II) (108 SC 1692, 100 LE2d 140) (1988) (stating that trial courts have an independent duty to investigate potential conflicts when alerted by objection from one of the parties to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth

---

[4] The trial court ordered that the mitigation investigator assigned to Jolly's case be removed and replaced with a mitigation investigator who had never had any contact with the main office where Fair's trial counsel was employed.

Amendment right to counsel). Thus, it was a critical part of Fair's trial proceedings at which he had the right to be present. See *Rice v. State*, 226 Ga. App. 770, 772 (1) (487 SE2d 517) (1997) (holding that a hearing held in a defendant's co-indictee's separate trial that addressed a possible conflict of interest arising from the defendant's attorney's representation of his co-indictee was a " 'critical stage of the proceedings' such that [the defendant's] right to be present was absolute"). Accordingly, the trial court was obligated to ensure Fair's presence or obtain a valid waiver. See *Brooks v. State*, 271 Ga. 456, 457 (2) (519 SE2d 907) (1999) (setting forth the conditions that are required for a valid waiver of a defendant's right to be present). Because the trial court failed to do either, we vacate the trial court's orders on any potential conflict of interest and remand this case to the trial court in order to conduct a new hearing on that issue to be held with Fair present, or to obtain a valid waiver from Fair. See id.

4. Although Fair does not allege that his right to be present at a critical stage of the proceedings was otherwise violated, our review of the record indicates that he may have been absent from other hearings in his case. The trial court is reminded that "[t]his Court has consistently considered the defendant's absence from a critical part of the trial as a defect not subject to harmless error analysis." *Holsey*, 271 Ga. at 860 (5), n. 11 (listing some of the proceedings that this Court has held were a critical part of the trial, the defendant's absence from which constituted error not subject to harmless error analysis). See also *Hampton v. State*, 282 Ga. 490, 492 (2) (a) (651 SE2d 698) (2007) (stating how a defendant waives the right to be present).

*Judgment affirmed in part, reversed in part, vacated in part, and remanded with direction. All the Justices concur, except Hunstein, C. J., and Benham, J., who dissent.*

HUNSTEIN, Chief Justice, dissenting.

I cannot agree that OCGA § 17-10-30 (b) (8), construed without a victim status scienter requirement, withstands scrutiny under the Equal Protection Clause. I have previously registered my disagreement with this Court's decision to construe the (b) (8) statutory aggravating circumstance as lacking a victim status scienter requirement. *Fair v. State*, 284 Ga. 165, 177 (664 SE2d 227) (2008) (Hunstein, P. J., concurring in part and dissenting in part). Being now bound, however, under the doctrine of stare decisis to construe OCGA § 17-10-30 (b) (8) as the Court's majority did in *Fair I*, I would find that the inevitable consequence of that construction is the invalidation of the (b) (8) statutory aggravating circumstance on constitutional grounds.

Contrary to the majority's conclusion, I can discern no "rational basis" for imposing the death penalty on defendants who at the

moment they fired the fatal shots neither knew nor should have known that their victim was a police officer. Though the majority ascribes to the Legislature the intent to "deter[ ] the crime of murder of peace officers, [and], in turn, . . . protect[ ] . . . those officers," Maj. Op. at 249, the majority wholly neglects to examine how the availability of the death penalty for crimes against peace officers can possibly effect any deterrence at all in circumstances in which the perpetrator has no knowledge of the victim's special status. Deterrence is, by definition, premised on awareness of the circumstance triggering the sought-to-be-avoided consequence. Thus, while the "deter and protect" rationale posited by the majority clearly constitutes a "legitimate state purpose," there is simply no "rational relationship" between such purpose and a (b) (8) statutory aggravating circumstance without a scienter requirement.

The absurdity of the result reached under the majority's analysis in Division 1 (A) is amplified in light of our construction of the immunity statute, see Division 2, as applicable only when deadly force is employed against one whose entry is unlawful in fact. According to the majority, both the defendant's eligibility for the death penalty and his entitlement to claim immunity depend on circumstances entirely beyond his knowledge at the time he committed the crime. The respective holdings in Divisions 1 (A) and 2 create the potential for wildly divergent outcomes in cases with facts similar to those in this case, depending on factors entirely unrelated to any differences in the defendant's culpability: two defendants committing the same actus reus with the same intent (i.e., killing a stranger, who has forcibly entered their home, in defense of habitation) may be subject to diametrically opposite outcomes, depending only on the fortuity of the victim's status as a police officer effecting a lawful entry. The act of shooting may be identical, the intent to defend habitation identical; yet, depending on circumstances beyond his knowledge or ability to know at the moment the trigger is pulled, the shooter may be subjected to death in one instance, entitled to immunity in the other.

In creating this bizarre state of affairs, the majority promotes the " 'capricious and arbitrary enforcement of the death penalty' " (citation omitted) *Jones v. State*, 279 Ga. 854, 859 (5) (622 SE2d 1) (2005), which is in fact precisely what our statutory aggravating circumstances are designed to prevent. I cannot in good conscience be complicit in this perversity and must, therefore, respectfully dissent to Division 1[5] of the majority opinion.

---

[5] Invalidation of the (b) (8) aggravating circumstance examined in Division 1 (A) would render it unnecessary to address the issues resolved in subdivisions (B) and (C) thereof.

I am authorized to state that Justice Benham joins in this dissent.

DECIDED NOVEMBER 22, 2010.

*Brian Steel, Elizabeth V. Rogan,* for appellant (case no. S10A1034).

*Jeffrey L. Grube, James S. Stokes,* for appellant (case no. S10A1035).

*Howard Z. Simms, District Attorney, Kimberly S. Schwartz, Garrison A. Wood, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Laura J. Murphree, Assistant Attorney General,* for appellee.