296 Ga. 703
FINAL COPY

S14A1336.  CORDERO v. THE STATE.

HUNSTEIN, Justice.

A Fulton County jury convicted Appellant Marco Cordero of felony murder and other serious crimes stemming from events on and between January 16-18, 2008, which resulted in the death of four-year-old Mark Mendez.  For assaults on the victim that occurred on and between September 1 to December 31, 2007, the jury convicted Appellant of cruelty to children in the first degree.[1]

---

[1] The crimes occurred on and between January 16-18, 2008, and on and between September 1 to December 31, 2007.  On January 25, 2011, a Fulton County grand jury indicted Appellant for malice murder, felony murder (predicated on cruelty to children in the first degree), felony murder (predicated on aggravated assault), cruelty to children in the first degree, and aggravated assault, in connection with the death of Mark Mendez by striking the child with the accused's hands, feet, and objects unknown, on and between January 16-18, 2008.  The grand jury also indicted Appellant for cruelty to children in the first degree and aggravated assault for causing the victim cruel and excessive physical and mental pain by striking the child with the accused's hands, feet, and objects unknown, on and between September 1 to December 31, 2007.  The jury returned its verdicts on March 7, 2011.  For events occurring on and between January 16-18, 2008, the jury found Appellant guilty of felony murder (predicated on cruelty to children in the first degree), cruelty to children in the first degree, and aggravated assault but not guilty of malice murder and felony murder (predicated on aggravated assault).  For events occurring on and between September 1 to December 31, 2007, the jury found Appellant guilty of cruelty to children in the first degree but not guilty of aggravated assault.  The court sentenced Appellant to life imprisonment on the felony murder verdict and 20 years to run concurrently on the first-degree child cruelty verdict stemming from events

Appellant appeals, contending that his trial counsel was constitutionally ineffective and that the trial court erred in sentencing him on the verdict of cruelty to children that was based on the events occurring on or between September 1 to December 31, 2007. For the reasons that follow, we affirm.

1. Viewed in the light most favorable to the verdict, the evidence shows that Appellant lived with his wife, Sabina Mendez, their three young children, including the victim, and a family friend, Milton Garcia, in an apartment in the basement of a hotel. The owner of the hotel permitted them to live there in exchange for Appellant doing some work for him. According to Mendez's testimony,[2] Appellant caused all of the victim's injuries, and the victim did not inflict any injuries upon himself. Mendez testified that, by August 2007, the victim began rubbing his feces on the walls, and Appellant began to regularly

occurring on and between September 1 to December 31, 2007. The child cruelty and aggravated assault counts stemming from events occurring on and between January 16-18, 2008, merged for sentencing purposes. Appellant filed a timely motion for new trial, which he amended on September 28, 2012. On June 21, 2013, the trial court denied Appellant's motion for new trial, as amended, and on July 15, 2013, Appellant filed a notice of appeal. The appeal was docketed to the September 2014 term of this Court and was submitted for decision on the briefs.

[2] Mendez entered a guilty plea to one count of cruelty to children in the first degree in exchange for her testimony against her husband.

2

and badly beat the victim as a result. On November 26, 2007, Appellant saw that the victim had dirtied the bathroom; he then bathed him in ice water (which he continued to do regularly) and severely beat him, hitting him with a screwdriver, using both ends, and a plunger. According to Mendez, the beating caused the victim's head to swell and left scratches on him. During the beating, Mendez tried to intervene, but Appellant pushed her away. On other occasions, Appellant used knives and machetes to inflict injuries on the victim, and one day beat the victim with a broom until the handle broke off, at which point Appellant forced the handle into the victim's mouth until he "broke his mouth." During the night of December 29, 2007, Mendez heard the victim crying and yelling. She found Appellant in the bathroom, hitting the victim all over his body with a plunger, a wet towel, and a piece of wood. The next day, Appellant, who said he had tired of beating the victim, rubbed a habanero chili all over the victim's body, including his genitals and buttocks, and stuffed the chili in the victim's rectum.

On January 16, 2008, the victim began yelling, and Appellant tied the victim upside down by his feet from the shower door. Appellant left, and Mendez untied the victim. After she did so, the victim defecated and began

3

spreading it around. Appellant returned, beat the victim with a piece of wood and belts, and tied him up with some wire. Mendez testified that Appellant said that he was beating the victim in order "for the devil to come out." On that same occasion, Appellant punched and kicked the victim, which caused his nose and eyes to bleed. Appellant then left for work, leaving the victim tied up with wire.

On January 17, 2008, the victim was vomiting and told his mother that his stomach hurt. Mendez asked Appellant to take the victim to the hospital, but Appellant refused. That evening, Appellant forced the victim to sleep in the shower without a blanket or pillow. On January 18, 2008, Mendez found the victim in the shower with a fever, looking extremely ill, and vomiting. She told Appellant that the victim was not well and vomiting, and Appellant told her that the victim should "eat his vomit back." Appellant then left to do some work for the hotel owner. Later that morning, Appellant called her husband and told him that the victim was "really sick." Appellant said that he did not want to spend money to take the child to the hospital and that the child needed a healer because he was possessed. Shortly thereafter, Appellant arrived home and continued to refuse to take the victim to the doctor. Mendez ran to the hotel owner and asked him to come to the apartment. Once Appellant's boss saw the victim, he told

4

Appellant that the victim needed to go to the hospital.

Appellant took the victim to Piedmont Hospital, arriving at 12:44 p.m., gave the child to a charge nurse, and claimed that the child had fallen in the bathtub the night before.[3] The nurse testified that the victim was not breathing, was non-responsive, and had no pulse when he arrived at the emergency room. The nurse also observed that the victim's injuries were not consistent with a fall and that the victim was blue and covered in vomit and bruises. The nurse believed that the victim's condition was the worst she had ever seen in her thirty years of experience as an emergency room nurse. Medical personnel attempted to resuscitate the victim, but he never regained consciousness and was pronounced dead six minutes after arriving. The hospital took photographs of the victim's injuries and notified police.

A Spanish-speaking police officer waited with Appellant at the hospital and noticed that Appellant was extremely nervous. On multiple occasions, Appellant told the officer that the victim was possessed by the devil and had hurt himself by running into walls repeatedly. Appellant also kept asking the

[3]Appellant spoke only Spanish and was unable to give more details due to the language barrier.

officer if he was going to jail. Detectives later interviewed Appellant, who said that the child had fallen in the bathtub and hit his head. He later admitted that he had also punched the victim in the stomach a few days earlier and said that he "felt that his wife didn't have anything to do with this." He also told detectives that the victim was possessed, said and did "crazy things," scratched himself, defecated on himself, hit himself with whatever objects he could find, hit his head on the toilet, ran into sharp corners to injure himself, said that he wanted to have sex with his mother, and told Appellant that he would "not rest" until Appellant went to jail. According to Appellant, he was the only one who disciplined the victim, who was "mommy's little boy" and was protected by Mendez. He admitted that he sometimes "got a little heavy handed" when he disciplined the victim, and in response to the statement, "[i]f it wasn't you, it was your wife," Appellant said that it was not her, that she "always is taking care of him." After Appellant's interview was completed, he asked the detective "how much time [he was] going to get for this."

Garcia witnessed Appellant hit the victim on his legs and hands, including with a shoe, pull the victim's ear, and yell at him, but he did not see any physical injuries on the victim that made him think the victim was being physically

6

abused. He also testified that he did not see the victim do anything to hurt himself. Garcia never witnessed Mendez strike or hit the victim. The owner of the hotel in which Appellant and his family lived testified that he noticed some bruises and cuts on the victim's head and arms and asked the parents about it. Appellant said that the victim was inflicting the injuries on himself by doing things such as falling on the floor to try to hurt his head and getting knives to try to cut himself. When Appellant took the victim to the hospital on January 18, he told the medical staff that the victim had suffered his injuries by falling in the bathtub the night before; however, a search of Appellant's apartment conducted on January 18 revealed that there was no bathtub in the family's residence, and the officer who conducted the search said that he did not see any signs of trauma or injury in the bathroom. Forensic testing showed that a pair of Appellant's sneakers had the victim's blood on them.

A medical examiner determined that the cause of the child's death was generalized blunt force trauma to the head, torso, and extremities. He opined that there was not one particular hit that killed the victim, but that the "constellation of all the injuries" that the victim suffered eventually caused him to go into shock and suffer cardiac arrhythmia, resulting in death. He located

7

more than 60 different scars, contusions, abrasions, lacerations, and hemorrhages over the victim's battered body, all of which he opined would have been painful to the child. The injuries on the victim's head were not consistent with falling but instead could have been caused by a fist, a broom handle, a screwdriver, or a piece of wood.

An expert in forensic pediatrics and child abuse testified that the victim suffered from battered child syndrome, the victim's injuries were not self-inflicted, the injuries would have caused the victim excessive mental pain, and the victim's action of smearing feces on the wall was a response to the repetitive physical abuse he suffered. He also said that there was not any one blow that was lethal to the victim, but that the victim suffered so many injuries that he went into shock, which caused cardiac arrhythmia and death.

Appellant testified, saying that he would discipline the victim if he behaved inappropriately but denying that he ever beat him with a plunger or pieces of wood and denying that he hung him upside down on the shower door.

Viewing the evidence in the light most favorable to the verdict and leaving "questions of credibility and the resolution of conflicts in the evidence to the jury," Bradley v. State, 292 Ga. 607, 609 (740 SE2d 100) (2013), we readily

8

conclude that the evidence was sufficient to authorize a rational jury to find beyond a reasonable doubt that Appellant was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. After the jury began its deliberations, it asked the trial court two questions: (1) "Does the failure to prevent an event constitute causing that event?"; and (2) "When ruling on a felony murder charge, must the corresponding felony ruling be the sole cause of death, or may it be just one component of death?" The trial court provided the jury with two answers proposed by defense counsel. The court answered "No" to the first question, and with regard to the second question, told the jury that, "[i]n order to find the defendant guilty of felony murder, you must first find the defendant guilty beyond a reasonable doubt of the underlying felony charges in the indictment for that count."

Appellant contends that trial counsel was ineffective in providing the foregoing answers to these questions. To prevail on this claim, Appellant must show that his counsel performed deficiently and that, but for the deficiency, there is a reasonable probability that the outcome of the trial would have been

9

more favorable to him. See Strickland v. Washington, 466 U. S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). "This burden, although not impossible to carry, is a heavy one." Young v. State, 292 Ga. 443, 445 (738 SE2d 575) (2013). Moreover,

> a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

Strickland, 466 U. S. at 697.

Appellant contends that the two answers could have confused the jury and left it to believe that it only had to find Appellant guilty of the underlying felony to find him guilty of felony murder, without regard to whether his actions caused the victim's death during the commission of the felony and without regard to whether his wife actually inflicted the victim's injuries and was thus an intervening cause that relieved him of criminal liability. More specifically, he contends that the trial court should have charged more fully on the principles of proximate cause set forth in State v. Jackson, 287 Ga. 646, 648-649, 654, 660 (697 SE2d 757) (2010) (holding that the phrase "causes the death of another

10

human being" in our felony murder statute, see OCGA § 16-5-1 (c), means proximate causation; stating that, in homicide cases, when a defendant inflicts an injury, the injury is the proximate cause of death when "(1) the injury itself constituted the sole proximate cause of the death; or that (2) the injury directly and materially contributed to the happening of a subsequent accruing immediate cause of the death; or that (3) the injury materially accelerated the death, although proximately occasioned by a pre-existing cause"; and stating that "[p]roximate causation imposes liability for the reasonably foreseeable results of criminal . . . conduct if there is no sufficient, independent, and unforeseen intervening cause") (citation and punctuation omitted)).

We conclude, however, that even if trial counsel did err in failing to request a charge on proximate causation based on Jackson, Appellant has failed to show that there is a reasonable probability that, but for counsel's error, the outcome of the trial would have been more favorable to him. As reasonably conceded at trial by counsel, the victim's injuries were not self-inflicted; instead, he was repeatedly beaten by someone and those beatings caused his death. Appellant's defense was that his wife, who spent more time at home with the victim than he did, inflicted the injuries on the child and that he did not inflict

11

any of them.  Moreover, the trial court's initial charge and recharge, considered as a whole, instructed the jury that it could only find Appellant guilty of felony murder if the jury found that he had committed one of the two underlying felonies against the victim and caused the victim's death in doing so.  The court also charged that the child's death

> must have been done in carrying out the unlawful act and not collateral to it.  It is not enough that the homicide occurred soon or presently after the felony was attempted or committed.  There must be such a legal relationship between the homicide and the felony so as to cause you to find that the homicide occurred before the felony was at an end or before any attempt to avoid conviction or arrest for the felony, the felony must have a real relationship to the homicide, be at least concurrent with it in part and be a part of it in an actual and material sense.
>
> A homicide is committed in the carrying out of a felony when it is committed by the accused while engaged in the performance of any act required for the full execution of the felony.

Thus, the recharge and charge, as a whole, more than adequately presented Appellant's defense that the jury could not find him guilty if it found that his wife had committed the underlying felonies.  Moreover, once the jury found that Appellant had committed the underlying felony of cruelty to children, there was no dispute that the beatings that constituted that crime were the proximate cause of the victim's death.  For these reasons, we conclude that even if counsel had

requested that the trial court charge on the principles of proximate cause discussed in Jackson and the court had done so, there is not a reasonable probability that the outcome of Appellant's trial would have been different.

3. Appellant contends that the verdict of guilty on the count of cruelty to children for events that occurred on and between September 1, 2007, to December 31, 2007, merged as a matter of fact into the felony murder verdict and that the trial court therefore erred by sentencing him on that verdict. We disagree.

OCGA § 16-1-7 (a) provides that "[w]hen the same conduct of an accused may establish the commission of more than one crime, the accused may be prosecuted for each crime. He may not, however, be convicted of more than one crime if: (1) One crime is included in the other . . . ." OCGA § 16-1-6 (1) provides, in relevant part, that a crime is "included in" the other where "[i]t is established by proof of the same or less than all the facts or a less culpable mental state than is required to establish the commission of the [other crime]." In Drinkard v. Walker, 281 Ga. 211, 214 (636 SE2d 530) (2006), we adopted the "required evidence" test for determining when one crime is "included in" another under OCGA § 16-1-6 (1) and therefore merges as a matter of fact.

13

"'[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" Drinkard, 281 Ga. at 215 (quoting Blockburger v. United States, 284 U. S. 299, 304 (52 SCt 180, 76 LE 306) (1932)).

Because the required evidence test does not permit convictions of both the underlying felony and felony murder (the underlying felony is always established by proof of the facts required to establish the felony murder), the trial court properly merged the verdict on the underlying felony of cruelty to children for events occurring on and between January 16 to January 18, 2008, with the felony murder verdict. Appellant, however, contends that the separate verdict on the felony of cruelty to children for events occurring from September to December 2007 should also merge because the medical examiner and child abuse expert both testified that the victim's death was not caused by any one blow but by the accumulation of beatings over the course of many months, which ultimately caused the victim to go into shock on January 18, 2008, and die from cardiac arrhythmia.

It appears that we have not addressed the precise merger question

presented here, which involves both (1) a deliberate interval between acts causing injury and (2) expert testimony affirmatively opining that none of the acts causing injury, either before or after the deliberate interval, would have on its own resulted in the victim's death. The issue thus presented is: when a defendant inflicts non-fatal injuries on a victim, followed by a deliberate interval, and then inflicts more non-fatal injuries, which in combination with the earlier non-fatal injuries cause the victim's death, is the earlier, non-fatal crime independent of the subsequent homicide, such that the defendant may be sentenced for both crimes?

In situations where a non-fatal injury is followed by a deliberate interval and then the infliction of a fatal injury, we have held that the crime resulting in the initial non-fatal injury does not merge as a matter of fact into the crime resulting in the fatal injury. See Coleman v. State, 286 Ga. 291 (3) (687 SE2d 427) (2009) (citing cases).[4] In this context, the crime resulting in the non-fatal injury is an independent act that does not merge with the crime resulting in the

---

[4] On the other hand, "[w]hen a victim suffers multiple wounds inflicted in quick succession, each infliction of injury does not constitute a separate assault." Coleman, 286 Ga. at 295.

15

fatal injury. Id. at 295. Similarly, we have held that where one crime is completed before another crime, the "same conduct" does not establish the commission of both offenses, and "(t)he rule prohibiting more than one conviction if one crime is included in the other does not apply." See Jones v. State, 290 Ga. 670, 672-673 (725 SE2d 236) (2012) (citation and punctuation omitted). However, in a case in which the

> medical examiner who performed the autopsy testified that the cause of death was "gunshot wounds," did not identify any injury as the fatal shot, acknowledged he could not testify as to the order in which the bullets entered the victim's body, and stated no single wound would have instantly stopped the victim[,]

we held that, even if "the multiple wounds were not inflicted in quick succession," because there was no evidence that a non-fatal shot was followed by a deliberate interval before the fatal shot, the aggravated assault verdict merged with the malice murder verdict. Coleman, 286 Ga. at 295.

For the reasons that follow, we conclude that, under the circumstances of this case, the acts of cruelty that occurred between September and December 2007 constitute an "independent act" separate and apart from the January 2008 acts of cruelty, on which the underlying felony for felony murder was based. First, there was a "deliberate interval" between the acts of cruelty to the victim

16

that occurred between September and December 2007 and those that occurred in January 2008. Also, the jury would have been authorized to infer that the victim would have lived if the cruelty had stopped in December 2007, as there was no evidence that the injuries suffered by the victim in 2007 would have caused his death. The crime of cruelty to children based on the acts of cruelty occurring in late 2007 was thus completed before the January 2008 crimes of felony murder and cruelty to children occurred.

Moreover, the jury would have been authorized to find that the January 16 to January 18 acts of cruelty were, by themselves, the proximate cause of the victim's death. An injury is the proximate cause of death if it "'materially accelerated the death, although proximately occasioned by a pre-existing cause.'" Castro v. State, 295 Ga. 105, 107 (757 SE2d 853) (2014) (citation omitted). In Castro, the mother of the two-year-old victim was indicted along with Castro for murder and other crimes, based on the theory that she failed to seek medical treatment for the victim after a week in which Castro beat the victim numerous times, resulting in her death. See id. at 105, 107. We held that the evidence was sufficient to show that the mother's actions were the proximate cause of the victim's death because her refusal to take the victim to the hospital

17

on the day she died materially accelerated the victim's death, even though Castro's beatings were a pre-existing cause. See id. at 107. Accord Bryant v. State, 270 Ga. 266, 268-269 (507 SE2d 451) (1998) (holding that although the victim, who was shot during a robbery and died at home two months later from a pulmonary embolism, "had previously suffered from some conditions that might have put her at risk for pulmonary embolism, the injuries she sustained in appellants' attack on her . . . 'materially accelerated the death, although (it was) proximately occasioned by a pre-existing cause.'" (citation omitted); Durden v. State, 250 Ga. 325, 329 (5) (297 SE2d 237) (1982) (holding that the jury was authorized to find that the defendant proximately caused the victim's death where the defendant exchanged gunfire with the victim while burglarizing his store and the victim, who was not shot, died from a heart attack a few minutes later, stating that "[w]here one commits a felony upon another, such felony is to be accounted as the efficient, proximate cause of the death whenever it shall be made to appear . . . that the injury materially accelerated the death, although proximately occasioned by a pre-existing cause"). We have also noted that "'the offender takes his victim as he finds him,'" Fair v. State, 288 Ga. 244, 249 (702 SE2d 420) (2010), and Judge Posner has written that "[t]he tortfeasor

18

takes his victim as he finds him (emphatically so if the victim's weakened condition is due to earlier, albeit time-barred, torts of the same tortfeasor); that is the eggshell-skull rule." Lancaster v. Norfolk & W. Ry., 773 F2d 807, 822 (7th Cir. 1985). Although that was a tort case, we have generally comparably treated proximate cause in tort and criminal law. See State v. Jackson, 287 Ga. at 648, 654 ("Georgia is a proximate cause state. When another meaning is not indicated by specific definition or context, the term 'cause' is customarily interpreted in almost all legal contexts to mean 'proximate cause'"; "Proximate causation imposes liability for the reasonably foreseeable results of criminal (or, in the civil context, tortious) conduct if there is no sufficient, independent, and unforeseen intervening cause.").

Applying these principles here, we conclude that, when Appellant beat the victim in January 2008, he took the victim as he found him, weakened by Appellant's own beatings and susceptible of dying from further beatings. We thus readily conclude that the jury could infer that the acts of cruelty committed on and between January 16 to 18, 2008, were the proximate cause of the victim's death — they "'materially accelerated the death, although proximately occasioned by a pre-existing cause.'"

Under all the foregoing circumstances, we conclude that the crime of cruelty to children, based on the non-fatal injuries that occurred from September to December 2007, is an independent crime that does not merge with the crime of felony murder, based on the events of January 16 to January 18, 2008. This case is unlike Coleman, in which there was no evidence by which the jury could infer that there was a completed, non-fatal assault followed by a deliberate interval and a later assault that was the proximate cause of death. Moreover, to conclude that the multiple acts of cruelty committed over many months against the victim in this case, when separated by a significant interval, constitute only one crime would mean that Appellant was permitted to brutalize the victim for many months with impunity.

Judgment affirmed. All the Justices concur.

Decided March 16, 2015.

Murder. Fulton Superior Court. Before Judge Adams.

Sheueli C. Wang, for appellant.

Paul L. Howard, Jr., District Attorney, Paige Reese Whitaker, Sheila E. Gallow, Joshua D. Morrison, Assistant District Attorneys, Samuel S. Olens,

20

Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula

K. Smith, Senior Assistant Attorney General, Katherine L. Iannuzzi, Assistant

Attorney General, for appellee.