321 Ga. 638
FINAL COPY

S25A0134. CRAFT v. THE STATE.

MCMILLIAN, Justice.

Ozell Craft challenges his convictions for malice murder and other crimes in connection with the shooting death of Marcus Sims.[1] Craft's sole enumeration of error is that the trial court committed plain error by failing to provide an additional jury instruction on his

---

[1] The crimes occurred on September 9, 2019. On February 25, 2020, a DeKalb County grand jury indicted Craft for malice murder, felony murder, two counts of aggravated assault with a deadly weapon, and possession of a firearm during the commission of a felony. At a trial from December 8 to 13, 2021, the jury found Craft guilty of all charges. On January 27, 2022, the trial court sentenced Craft to serve life in prison for malice murder, ten years in prison consecutive for one count of aggravated assault, and five years in prison consecutive to the life sentence, but concurrent with the aggravated assault sentence, for possession of a firearm during the commission of a felony. Although the trial court purported to merge the felony murder count, that count was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-72 (4) (434 SE2d 479) (1993). The other aggravated assault count should have merged with the malice murder count for sentencing purposes, although the trial court purported to merge it with the felony murder count. See *Miller v. State*, 309 Ga. 549, 552 (3) (847 SE2d 344) (2020). On February 10, 2022, Craft filed a motion for new trial. On April 18, 2024, the trial court held a hearing on the motion, at which Craft was represented by new counsel. On April 23, 2024, the trial court entered an order denying the motion. Craft filed a timely notice of appeal. The case was docketed in this Court to the term beginning in December 2024 and submitted for a decision on the briefs.

defense of habitation theory of justification. However, as explained below, Craft failed to carry his burden to show that this alleged error likely affected the outcome of his trial. Accordingly, we affirm.

1.    The evidence at trial showed as follows. On the morning of September 9, 2019, Craft, who was 17 years old, was getting ready for school when he texted a friend, 20-year-old Khalil Rogers, to see if Rogers was still interested in buying Craft's Springfield XD .45-caliber pistol. Rogers texted back that he was, drove to Craft's house, and picked up Craft. Rogers then drove to a fast food restaurant near the high school that he had attended and picked up two of their friends, John Jackson and Ryan Solomon.

Rogers drove the group to a store, where he obtained $300 that a friend had sent him through MoneyGram. When the group got back to the car, Rogers gave Craft $250, and Craft handed Rogers his Springfield pistol, which Rogers noticed had three cartridges in the magazine. Rogers also had his Smith & Wesson 9mm pistol in the car, which had a cartridge in the chamber and a fully loaded magazine of 15 cartridges. There were no other firearms in Rogers's

car.

The group then decided to buy some marijuana and smoke it. They called several contacts without success until Craft reached Sims, who agreed to sell them marijuana. Rogers drove the group to Sims's apartment complex, which was located next to Craft's apartment complex. When they arrived, Craft got out of the car, walked to Sims's apartment, and bought some marijuana from Sims. Sims noticed the Springfield pistol, which Craft brought with him when he went to get the marijuana. Sims asked if Craft would sell Sims the pistol. Craft said that he could not because it was not his and that the pistol instead belonged to Rogers.

Sims accompanied Craft back to the car, where Craft handed the Springfield pistol to Rogers. Sims told Rogers that he wanted to buy it and offered Rogers $250. Rogers said that he would not sell it for that amount but would sell it for $350. Sims said that he would not pay that much but asked Rogers "to take his number down." Rogers saved Sims's number in his phone and said that he would call Sims later.

Rogers drove the group to Craft's apartment complex. Rogers backed into a parking space at the end of a row in front of Craft's building, which was at the very back of the complex. Craft, Rogers, Jackson, and Solomon then smoked marijuana for about 30 minutes before Sims drove up with his girlfriend, Arianna Evans, and parked his car directly in front of Rogers's car, so that the two cars were facing each other. Rogers grabbed the Springfield pistol and put it in his lap, and Craft did the same with Rogers's Smith & Wesson 9mm pistol.

Sims got out of his car, walked around to the driver's side of Rogers's car, and asked Rogers through the open window why Rogers had not called him. Sims told Rogers to "stop playing with his money," pulled out a wad of cash, and said, "[M]y money good." Rogers then told Sims, "I really don't want to sell the gun." Craft "chuckled," and Rogers looked toward Craft. At that moment, Sims reached through the open window and snatched the Springfield pistol off Rogers's lap. Rogers grabbed the barrel of the Springfield pistol, a struggle ensued, and seconds later, Craft fired the Smith &

Wesson 9mm pistol, hitting Sims once in the chest. When Rogers heard the gunshot, he let go of the barrel of the Springfield pistol. Sims yelled to Evans, who was still sitting in his car, "I'm hit; call 911," before collapsing facedown on the pavement with the Springfield pistol.

As soon as the gunshot rang out, everyone in Rogers's car got out, and Rogers, Jackson, and Solomon ran away. Evans got out of Sims's car, ran to him, and tried to comfort him, but he was not responding to her, although he was still breathing. Craft, who had the Smith & Wesson 9mm pistol in his hand, walked from the passenger side of Rogers's car, around the back of the car, and to the driver's side, where Sims was lying unresponsive on the pavement. Evans knew Craft from "around the neighborhood," and when she saw him, she got up, put her hands in the air, and started backing away. Craft stood a few feet from Sims and shot him nine more times with the Smith & Wesson 9mm pistol.

Craft then went to the nearest building and yelled to Rogers through the breezeway, "[C]ome on, let's go." Craft said, "He's

done[.] He's over[.] He's dead[.] He's gone[.] Out of here." Rogers ran back to his car, took the Springfield pistol out of Sims's hand, and got into the driver's seat. Sims was barely breathing. When Rogers examined the Springfield pistol, he noticed that it still had three cartridges in the magazine.

Craft followed Rogers back to Rogers's car, walked to the passenger side, and pointed the Smith & Wesson 9mm pistol at Evans, who still had her hands up because she was scared and did not know what to do. Craft yelled, "[B]***h, move the f*****g car; move the car." Evans got into the driver's seat of Sims's car, and Craft got into the other car with Rogers. Evans was unable to move Sims's car out of the way, so Rogers put his car in reverse, backed up over the curb onto the grass, and drove forward around Sims's car.

Rogers drove home, where he showered, changed clothes, and gave Craft a t-shirt to change into. Rogers got into a different vehicle, a Toyota 4Runner, and drove Craft to his high school. Craft was arrested at school a few hours later.

Law enforcement officers arrived at Craft's apartment complex within minutes of the shooting, but Sims was already dead. A medical examiner conducted an autopsy on Sims's body and determined that he had been shot a total of ten times and that the cause of death was multiple gunshot wounds. There were two entrance wounds on the front of the body, one in the chest and one in the left thigh. The bullet that hit Sims in the chest pierced his left lung before exiting out his back. Sims could have survived "a number of minutes" after receiving that injury. The other eight entrance wounds were on the backside of Sims's body. The bullets that hit Sims on his backside caused numerous injuries, including piercing his heart, lungs, liver, right kidney, and bladder.

All of the cartridge casings recovered from the crime scene were 9mm. Emily Bagwell, an expert in firearms examination and tool mark identification, examined nine 9mm shell casings recovered from the area around Sims's body and one 9mm shell casing recovered from the rear driver's side floorboard of Rogers's car. She also examined five bullets extracted from Sims's body during the

7

autopsy. She determined that all ten shell casings were fired from the same firearm; that all five bullets were fired from the same firearm; and that the shell casings and bullets were all consistent with having been fired from a Smith & Wesson 9mm pistol.

2. Craft contends that the trial court erred in failing to provide an additional jury instruction on his defense of habitation theory of justification. Although the court agreed to give the additional jury instruction during the charge conference, the court inadvertently omitted it when charging the jury. After the jury charge, Craft did not object to the omission. Thus, as Craft recognizes, we review his claim only for plain error. See OCGA § 17-8-58 (b).

To show plain error, Craft must point to an error that was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome, and seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *Woodard v. State*, 296 Ga. 803, 806 (2) (771 SE2d 362) (2015). "Satisfying all four prongs of this standard is difficult, as it should be." *State v. Kelly*,

290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (cleaned up). "We need not analyze all of the elements of the plain error test when the defendant has failed to establish one of them." *Ruthenberg v. State*, 317 Ga. 227, 231 (2) (892 SE2d 728) (2023) (cleaned up). When evaluating claims of instructional error, we examine the jury charge as a whole. See *Woodard*, 296 Ga. at 806-07 (2).

The defense of habitation statute, OCGA § 16-3-23,[2] explains that a person may lawfully threaten or use force against another

---

[2] OCGA § 16-3-23 says in full:

A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation; however, such person is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(1) The entry is made or attempted in a violent and tumultuous manner and he or she reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of personal violence;

(2) That force is used against another person who is not a member of the family or household and who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using such force knew or had reason to believe that an unlawful and forcible entry occurred; or

(3) The person using such force reasonably believes

9

person "when and to the extent that" he reasonably believes it is necessary "to prevent or terminate" the other person's "unlawful entry into or attack upon" a "habitation," which OCGA § 16-3-24.1 defines to include a "motor vehicle." OCGA § 16-3-23 then lists the three situations in which such a person is justified in using deadly force, i.e., "force which is intended or likely to cause death or great bodily harm." See also *Fair v. State*, 288 Ga. 244, 257 (2) (A) (3) (702 SE2d 420) (2010) ("[T]he elements set forth in the introductory clause . . . are necessary to justify the use of *any* force or threats of force in defense of habitation in *any* circumstances. [Paragraphs] (1), (2), and (3) set forth the *additional* elements necessary to justify the use of *deadly* force in three different contexts." (emphasis in original)). All three situations in which the use of deadly force is authorized in defense of habitation involve an actual entry or attempted entry into a habitation. See OCGA § 16-3-23 (1)-(3).

that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

10

As Craft requested, the trial court instructed the jury on paragraph (1) of OCGA § 16-3-23, which authorizes the use of deadly force when the entry is attempted or made "in a violent and tumultuous manner" and the person using deadly force reasonably believes both that the "entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein" and that "such force is necessary to prevent the assault or offer of personal violence." The court also agreed to instruct the jury on paragraph (3) of OCGA § 16-3-23, which in some ways is broader than paragraph (1), but inadvertently omitted that instruction when it charged the jury. Paragraph (3) authorizes the use of deadly force when "[t]he person using such force" reasonably believes both that the "entry is made or attempted for the purpose of committing a felony therein" and that "such force is necessary to prevent the commission of the felony."[3]

Craft argues that the trial court erred in failing to instruct the

---

[3] Craft did not request, and the trial court did not give, a jury instruction on paragraph (2) of OCGA § 16-3-23, which applies only to the use of deadly force in defense of an actual "residence."

11

jury on paragraph (3) of the defense of habitation statute because there was at least slight evidence that Sims unlawfully entered Rogers's car by reaching into it and that Craft reasonably believed both that Sims's entry was made for the purpose of committing a felony in the car (namely, robbery of the Springfield pistol from Rogers) and that the use of deadly force was necessary to prevent Sims's commission of the robbery. See OCGA § 16-8-40 (a) ("A person commits the offense of robbery when, with intent to commit theft, he takes property of another from the person or the immediate presence of another: (1) By use of force; . . . or (3) By sudden snatching."), (b) ("A person convicted of the offense of robbery shall be punished by imprisonment for not less than one nor more than 20 years."). See also OCGA § 16-8-2 ("A person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property . . . .").

We assume, without deciding, that Craft was justified in firing the initial shot that struck Sims in the chest. After all, the evidence

showed that when Craft fired the initial shot, he was sitting in the front seat of Rogers's car, and Sims and Rogers were struggling for control of the loaded Springfield pistol, which was pointed inside the car. However, even assuming that the trial court committed a legal error that was obvious beyond dispute when it charged the jury on defense of habitation but omitted a jury instruction on paragraph (3) of the defense of habitation statute, Craft's plain error claim still fails because he has not carried his burden to show that the omission likely affected the outcome of the trial.

The evidence of Craft's guilt and that he was not justified in shooting Sims while Sims was on the ground was overwhelming. The evidence showed that Sims was still alive after Craft shot him the first time. After the initial shot, everyone got out of Rogers's car, including Craft. But instead of running away like the others, Craft walked from the passenger side of Rogers's car, around the back of the car, and to the driver's side, where Sims, who was still breathing but unable to respond to his girlfriend, was lying facedown on the pavement. Craft then shot Sims nine more times, piercing his heart,

lungs, liver, right kidney, and bladder, and causing his death.

Given this evidence, Craft has failed to carry his burden to show that a jury instruction on paragraph (3) of the defense of habitation statute would have made a difference in the outcome of his trial. When Craft fired the nine additional shots that eventually killed Sims, Sims was no longer making or attempting to make an entry into Rogers's car that Craft could prevent or terminate through the use of force, deadly or otherwise. Craft's conduct therefore was not justified as defense of habitation under paragraph (3). See OCGA § 16-3-23 (authorizing a person to threaten or use force against another person "*when and to the extent that* he or she reasonably believes that such threat or force is *necessary to prevent or terminate* such other's *unlawful entry* into or attack upon a habitation" (emphasis added)); *Walker v. State*, 301 Ga. 482, 486 (2) (b) (801 SE2d 804) (2017) ("[A]mong other things, for defense of habitation to apply in this case, there would need to be evidence that [the decedent] was entering or attempting to enter the SUV *at the time that Appellant shot him*." (emphasis added)). See also *Swanson*

14

*v. State*, 306 Ga. 153, 163 (2) (b) (829 SE2d 312) (2019) (noting that "our appellate courts have concluded in other cases that a defendant was not prejudiced by counsel's [professionally deficient] failure to request a jury charge on defense of habitation" where "the record showed the defendant used force against a victim who was no longer attempting to enter a habitation").

Having failed to show that the omission of the jury instruction likely affected the outcome of the trial, Craft's plain error claim fails. See *State v. Newman*, 305 Ga. 792, 797-98 (2) (a) (827 SE2d 678) (2019) (holding that the trial court's failure to charge on defense of habitation was not plain error because it "did not likely affect the outcome of the trial court proceedings" in light of the compelling evidence of defendant's guilt (cleaned up)).

*Judgment affirmed. Peterson, C. J., Warren, P. J., and Bethel, Ellington, LaGrua, Colvin, and Pinson, JJ., concur.*

Decided May 28, 2025.

Murder. DeKalb Superior Court. Before Judge Barrie.

*Dillon McConnell*, for appellant.

*Sherry Boston, District Attorney, Deborah D. Wellborn, Nicole D. Finnie, Andrew W. Turner, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Senior Assistant Attorney General, Stephany J. Luttrell, Assistant Attorney General*, for appellee.